UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN NERON,<br>        Plaintiff, | :<br>:<br>: |
| v. | : |
| | :    Case No. 3:08-CV-1533 (PCD) |
| JEFFRY W. COSSETTE,<br>        Defendant. | :<br>: |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff John Neron ("Neron"), formerly a police officer with the Meriden Police Department, brought this suit against Defendant Jeffry W. Cosette ("Cosette"), the Meriden chief of police, claiming that Cosette disciplined and constructively discharged him for engaging in constitutionally protected speech. On November 2, 2009, Cossette filed a motion for summary judgment. For the reasons stated herein, the motion for summary judgment [Doc No. 36] is **granted**.[1]

**I.    BACKGROUND**

The following allegations are set forth in the Complaint, Cossette's Rule 56(a)(1) Statement,[2] Neron's Rule 56(a)(2) Statement, and the affidavits and exhibits submitted by both parties in support of or in opposition to this motion. Because this case is at the summary judgment stage, this Court views the record in the light most favorable to Neron as the non-moving party. See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003).

---

[1]  Cossette has also filed a motion to strike certain exhibits submitted by Neron in opposition to the summary judgment motion [Doc. No. 42]. Because the Court finds that, even when considering the contested exhibits, Neron's claim fails as a matter of law, the Court declines to address the merits of the motion to strike.

[2]  The allegations in Cossette's Rule 56(a)(1) Statement are admitted by Neron in his Rule 56(a)(2) Statement, except as otherwise noted.

Neron, a Latino male of Puerto Rican descent, served as a full-time police officer with the Meriden police department from 1997 until February 2008, when he resigned. (Def.'s Rule 56(a)(1) Stmt. ¶ 1.)  He received numerous commendations during his service and average or above average evaluations throughout most of his career.[3]  (See Pl.'s Ex. 3-4.)

Beginning in early 2006, however, domestic disputes with Julia Resendez, the mother of Neron's daughter, began to interfere with his work.  On January 27, 2006, Resendez filed a complaint against Neron with the Meriden police department, claiming that he had restrained her. (Def.'s Rule 56(a)(1) Stmt. ¶ 4; Neron Dep. 40:6-10.)  On the same day, Neron and Resendez attended a meeting at the police station with two sergeants to mediate their dispute.  As a result of the meeting, Neron and Resendez agreed to live separately.  (Def.'s Rule 56(a)(1) Stmt. ¶¶ 5-6.)

Despite the mediation, Neron and Resendez's domestic disputes–and the Meriden police department's involvement in the disputes–continued.  On March 5, 2006, Meriden police officers visited Resendez's residence in response to a complaint Resendez made against Neron.  (Id. ¶ 7.)  On June 23, 2006, Neron filed a complaint against Resendez with the police department and requested that she be arrested; in response, officers visited the Resendez residence but did not arrest her.  (See id. ¶ 8.)  The next day, June 24th, while Neron was on duty as a patrol officer, he went to the police department to file another complaint against Resendez and request that she be arrested.  (Id. ¶ 9.)  On June 27, 2006, he was issued a written disciplinary notice for failing to

---

[3] In the last evaluation Neron received, which was for the year 2006, his supervisor Sergeant Michael Lyons gave him a below average rating for judgment.  The comment section stated that the rating was based on "issues involving [Neron's] personal life both on and off duty" and because Neron "[s]ometimes makes decisions on the street that could have been handled differently . . ." (Pl.'s Ex. 4.)

notify a dispatcher of his change in status and location while on duty on June 24th, as is required by department policy and procedure. (Id. ¶ 9; Pl.'s Rule 56(a)(2) Stmt. ¶ 10.) On or around August 30, 2006, Lieutenant Guidobono issued a directive to Neron stating that he would be allowed to visit his daughter during his lunch break but only with Resendez's consent. (Def.'s Rule 56(a)(1) Stmt. ¶ 19; Cossette Aff. ¶ 13.) Neron states he was also authorized to go to his daughter in an emergency. (Pl.'s Rule 56(a)(2) Stmt. ¶ 19.)

On September 24th, Neron again left his assigned patrol duty without notifying dispatch due to a conflict with Resendez. (Def.'s Rule 56(a)(1) Stmt. ¶ 12.) He was concerned that Resendez had allowed a mentally challenged individual to babysit their daughter. He went to Resendez's residence to check on his daughter, but no one was home. (Id.; Neron Dep. 51:6-54:8). He then went to the home of the individual he believed was babysitting his daughter, but no one was there either. (Id.) The next day he was arrested and charged with criminal trespass and disorderly conduct based on a complaint filed by Resendez about his conduct on September 24th. (Id. ¶ 11; Neron Dep. 53:11-17) The charges were ultimately dropped.

After learning about Neron's arrest, Cossette initiated an internal affairs investigation ("I.A. 06-62") of the incident, which was conducted by Sergeant Leonard Caponigro. As part of the investigation, Caponigro interviewed Neron about his on-duty conduct on September 24th. (Def.'s Rule 56(a)(1) Stmt. ¶ 24.) In a report of the investigation dated October 12, 2006, Caponigro concluded that Neron had violated two department regulations: refusal to obey the order of a supervisor and failure to properly patrol post. (Id. ¶ 26.) In a letter dated October 27, 2006, Neron was notified of the investigation's conclusions and a pre-disciplinary hearing scheduled for November 22, 2006, during which time Neron would be given an opportunity to

respond to the charges.  (Id. ¶ 27.)

On November 1, 2006, Neron filed a complaint against the Meriden police department with the Connecticut Commission of Human Rights and Opportunities ("CHRO").  (Pl.'s Ex. 5.)  The complaint alleges that Neron was denied certain placements and assignments, which resulted in lost wages, lost training, and lost opportunities for advancement, on the basis of his race and ancestry and as retaliation for being a potential witness in another CHRO hearing against the city of Meriden. (Id. ¶¶ 4, 32.)  The complaint also states that fewer than ten percent of the patrol officers are believed to be minorities, that no Latino patrol officer is believed to be in a supervisory capacity, and that "other minority Patrol Officers . . . have endured a pervasive history of discriminatory activity and conduct against them."  (Id. ¶¶ 7-8.)  The police department's counsel forwarded the complaint to the Meriden law department on November 22, 2006, which forwarded it to Cossette's secretary by memorandum dated November 27, 2006.  (Def.'s Rule 56(a)(1) Stmt. ¶ 29.)[4]  Cossette claims that he was first notified of the complaint some time between November 27th and November 30th.  (Cossette Aff.¶ 12.)

Neron was represented by a union attorney at the pre-disciplinary hearing on November 22nd.  Neron initially contended that he was on his lunch break when he left his post to check on his daughter on September 24th.  After being shown a document indicating that he took a lunch break two hours after his visit to the Resendez residence, he retracted his statement and admitted that he left his post before his break.  (Cossette Aff. ¶ 13; Neron Dep. 60:20-61:15.)  He

---

[4] Neron asserts that, although the CHRO complaint was signed and dated on November 1, 2006, "the complaint was initiated prior to that date."  (Pl.'s Rule 56(a)(2) Stmt ¶ 29.)  However, because he has provided no support for this statement, the date of the purportedly protected speech is deemed to be November 1, 2006.

acknowledged that he never requested nor received permission to leave his assigned post, and thus violated department rules and the directive concerning when he could visit his daughter. (Cossette Aff. ¶¶ 13-14.)  In a letter to Neron dated December 7, 2006, Cossette imposed a thirty-day suspension without pay in light of Caponigro's investigation, Neron's acknowledgment of his violation of the rules at the hearing, and Neron's untruthfulness during the hearing. (Id.; Cossette Aff. Ex. 3B.)  The letter also warned that any further acts of misconduct would result in more serious discipline up to and including termination.  (Def.'s Rule 56(a)(1) Stmt ¶ 32.)

In November 2006, Neron's supervisors reported two other complaints about his police work.  On November 8, 2006, Caponigro commenced Internal Affairs Investigation 06-78 ("I.A 06-78") after Shane Manchester, a civilian, telephoned Caponigro to complain about Neron's job performance.  (Id. ¶ 33.)  The circumstances surrounding the complaint occurred on July 11, 2005, when Neron arrived at the Manchester residence in response to a complaint.  Neron wrote in the police incident report that he would be applying for an arrest warrant charging Carrie Manchester with disorderly conduct and possession of marijuana.  (Id. ¶¶ 35-36.)  Caponigro found no record of an arrest warrant, arrest warrant application or any supplemental documents pertaining to Neron's efforts to procure an arrest warrant.  (Id.)  After interviewing Neron twice about the incident, he concluded that Neron failed to follow through with his intention to arrest Carrie Manchester and thus had violated two department regulations: performing assigned duties or other official work in a careless or negligent manner and failure to thoroughly search for, collect, preserve, and identify evidence of persons, property and locations in any arrest or investigation.  (Id. ¶¶ 37-38.)

The second incident occurred on November 28, 2006, when police officers found a

prisoner's bag that had been improperly processed. Although procedures required that each prisoner's personal property be put in a bag and placed a locker, the bag in question, which belonged to a prisoner named Daley, had been left on the floor rather than secured in a locker. (Id. ¶¶ 46-47; Pl.'s Rule 56(a)(2) Stmt. ¶ 46.) Sergeant Glenn Milslage, the officer who conducted an internal investigation of the matter ("I.A. 06-82"), determined that Neron had completed the prisoner property logs on the night in question and interviewed him as part of the investigation. (Def.'s Rule 56(a)(1) Stmt ¶ 49.) He concluded that Neron was the officer responsible for processing the prisoner's belongings, and therefore found that he violated the department regulation requiring secure storage of a detainee's property. (Id. ¶ 53.) Neron disputes that he violated any department regulation, though he has given inconsistent statements about the incident. He told Milslage that he did place a bag with Daley's name on it in a locker, but claimed during his deposition in this case that he left Daley's bag on the floor because there were not enough lockers for each prisoner's belongings. (Id. ¶¶ 49-50.) Neron claims that he initially recalled the events incorrectly because the night in question was extremely chaotic as over twenty prisoners were being processed at the same time and the department was experiencing equipment problems. (Pl.'s Rule 56(a)(2) Stmt. ¶ 49.)

After the investigative reports in I.A 06-78 and I.A. 06-82 determined that Neron had committed violations, a predisciplinary hearing was scheduled. A union attorney represented Neron at the hearing, and he was given an opportunity to defend himself. (Def.'s Rule 56(a)(1) Stmt. ¶ 55.) By letter dated January 17, 2007, Cossette imposed a thirty-day suspension without pay against him. (Id. ¶ 56.)

In November 2007, Neron was disciplined for failing to issue an arrest warrant on

October 23, 2007. On that day, while working in the lobby of the Meriden police station, Neron spoke with Jennifer Hayes, a civilian who wished to file a complaint against her ex-boyfriend for violating a "no contact" condition of release by sending her a harassing text message. (Id. ¶ 57.) Neron went to the Meriden courthouse to confirm that a valid "no contact" order was in effect. (Id. ¶ 58.) Since the ex-boyfriend was due in court that day, Neron claims that a court clerk instructed him to ask Hayes to bring the court order to the courtroom and speak to the prosecutor. Neron relayed the message to Hayes. ( Pl.'s 56(a)(2) Stmt. Disputed Facts ¶ 13.) Even though he was obligated under the Connecticut Family Violence Act and Meriden Family Violence Policy to initiate an arrest of the ex-boyfriend that day, he did not file an application for an arrest warrant. (See Def.'s Rule 56(a)(1) Stmt. ¶ 62.) On November 5th, after realizing that the ex-boyfriend never appeared at his court date on October 23rd, Neron called Hayes and asked her to come to the police station to fill out a complaint. (Pl.'s Rule 56(a)(2) Stmt.¶ 67.) When Hayes arrived, she spoke with Officer Shean concerning her complaint against her ex-boyfriend, and he took her statement in order to procure an arrest warrant. (Def.'s Rule 56(a)(1) Stmt. ¶ 67; Pl's Ex. 10, audio cd of Caponigro's Interview of Hayes). Officer Shean also advised Hayes that she should file a complaint against Neron for failing to apply for an arrest warrant on October 23rd. (See Pl.'s Ex. 10, audio cd of Caponigro's Interview of Hayes.)

Sergeant Barillaro determined that Neron had been derelict in his duty for failing to initiate the arrest of the ex-boyfriend on October 23rd, and he referred the matter to Lieutenant Richards in a memorandum dated November 12, 2007. (Def.'s Rule 56(a)(1) Stmt. ¶ 68.) Richards concluded that Neron violated department policy and state law, and referred the matter to Captain Topulos on November 13, 2007, who then referred it to Cossette. (Id. ¶¶ 69-70.)

Cossette initiated Internal Affairs Investigation 07-22 ("I.A. 07-72"), and assigned Caponigro to investigate the matter. (Id. ¶ 71.) After interviewing Hayes, Neron, and the clerk who spoke with Neron on October 23rd, Caponigro concluded that Neron may have violated department policy by failing to comply with lawful orders, procedures, and directives. (Id. ¶¶ 72- 74.) By letter dated January 4, 2007, Neron was notified that a pre-disciplinary hearing was scheduled for February 1, 2008 so that he could respond to the conclusions reached in I.A. 07-72.

Harry Elliot, an attorney with the Connecticut Council of Police Unions, served as Neron's union representative with respect to the charges in I.A. 07-72. (Id. ¶ 77.) Elliot advised Neron that, given his previous disciplinary history, he believed that the city might seek to terminate him at the hearing. (Id. ¶ 80.) He also advised him that the decision of whether to fight the charges or attempt to reach a settlement was Neron's. If he contested the charges and was terminated, the State Board of Mediation and Arbitration might overturn the termination and reinstate him with backpay. (Id. ¶¶ 81-82.) After some negotiations, Neron and the city reached a settlement on February 1, 2008 that contained, *inter alia*, the following provisions: 1) Neron would resign from his position effective February 2, 2008 and receive a lump payment of twelve weeks of base pay; 2) Neron would receive a payout of all vacation, sick earned and comp time as of February 2, 2008; 3) Neron and his daughter would be allowed to remain on their health insurance plan through September 30, 2008 paying only the weekly cost share; and 4) Neron agreed not to file any grievance, lawsuit, or other legal proceedings against the city based on his employment or resignation. (Pl.'s Ex. 6.)

On October 6, 2008, Neron filed this lawsuit against Cossette in his individual capacity. Neron claims that, after he filed the CHRO complaint, he was subjected to "a barrage of trumped

up charges and internal affairs investigations spearheaded by Chief Cossette[,]" including the four internal affairs investigations and two thirty-day suspensions described *supra*. (Pl.'s Mem. at 3-4.)  After more than a year of intolerable harassment, Neron claims he was coerced into signing a resignation on February 1, 2008.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Libby, Inc., 477 U.S. 242, 248 (1986).  "Conclusory allegations will not suffice to create a genuine issue."  Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990).  "There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'"  Id. (internal citations omitted).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at

that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In determining whether the parties have met their respective burdens, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)); see also FED. R. CIV. P. 56(e). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

### III.  DISCUSSION

Cossette makes four arguments in support of his motion for summary judgment. His first argument is that Neron's settlement agreement with the city of Meriden constitutes a valid waiver of any claims Neron may have against him. Second, Neron's retaliation claim fails as a matter of law because the undisputed evidence shows that Neron's speech was not on a matter of public

concern, that there is no causal connection between the protected speech and the adverse employment decisions, and that Cossette would have reached the same employment decisions regardless of Neron's speech. Third, Cossette is entitled to qualified immunity because it was objectively reasonable for him to believe that his actions in investigating and disciplining Neron's misconduct did not violate Neron's free speech rights. Lastly, Cossette argues that the evidence does not show that Neron was constructively discharged.

**A. Waiver**

Cossette contends that summary judgment should be granted because Neron's settlement constitutes a waiver of any claims he may have against Cossette. The settlement states: "Officer Neron agrees not to file any grievance, lawsuit, or legal proceedings *against the City* based on his employment or resignation" (Pl.'s Ex. 6) (emphasis added.) A lawsuit against a city official in his official capacity is a lawsuit against the city. "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." O'Connor v. Pierson, 568 F.3d 64, 71 (2d Cir. 2009) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985)). However, a government official sued in his individual capacity is not in privity with his government employer. Andrews v. Daw, 201 F.3d 521, 525-26 (4th Cir. 2000) (holding that a final judgment against a government employee in his official capacity does not bar under the *res judicata* doctrine a subsequent lawsuit against the government employee in his individual capacity); see also Stancuna v. Sherman, 563 F. Supp. 2d 349, 353-54 (D. Conn. 2008) ("Although the Second Circuit does not appear to have expressly so held, a number of other circuits have held that government employees in their individual capacities are not in privity with their government employer."). Therefore, a lawsuit

against a government employee in his individual capacity is distinct from a lawsuit against the government. Since Neron's lawsuit against Cossette in his individual capacity is not a lawsuit against the city of Meriden, the waiver provision does not apply.

**B. First Amendment Retaliation Claim**

In order to establish a First Amendment retaliation claim, a plaintiff must prove that: (1) he engaged in constitutionally protected speech because the speech was a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision. If a plaintiff makes this required showing, the defendant may nevertheless escape liability by demonstrating that he would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech. Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006), overruled on other grounds by Appel v. Spiridon, 531 F.3d 138, 139-40 (2d Cir. 2008). In moving for summary judgment, Cossette makes three arguments: 1) Neron's CHRO complaint was not a matter of public concern; 2) no trier of fact could conclude that Neron's speech was a motivating factor in the disciplinary actions taken against him; and 3) no trier of fact could conclude that Cossette would not have taken the same disciplinary actions absent Neron's speech. Each of these arguments is addressed in turn.

*1) Issue of Public Concern*

Cossette argues that Neron's CHRO complaint was based on his personal workplace grievances, and thus cannot be considered speech on a matter of public concern. There is no question that the primary purpose of the CHRO complaint was to seek redress for the racial discrimination Neron allegedly endured. Nevertheless, the Second Circuit "ha[s] repeatedly held that discrimination in a government workplace is a matter of public concern." Cotarelo v.

Village of Sleepy Hollow Police Dep't, 460 F.3d 247, 252 (2d Cit. 2006); see also Konits v. Valley Stream Centennial High School, 394 F.3d 121, 125 (2d Cir. 2005) ("[W]e have held repeatedly that when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern."). In Cotarelo, a police officer detailed instances of discrimination against Spanish-speaking officers in a letter to the police chief and subsequently in two lawsuits he brought against the police department. In reversing the district court's holding that the letter and lawsuits were not a matter of public concern because they involved personal grievances related to the officer's own employment interests, the Second Circuit noted that "the letter and the complaints in the lawsuit concern discrimination problems generally and were not limited to instances affecting only [the plaintiff]." Id. at 252. Here, as well, Neron's CHRO complaint described a history of discrimination against the protected class of which Neron is a member. Thus, it is speech on a matter of public concern.

*2) Causal Connection*

"To survive a motion for summary judgment on a First Amendment retaliation claim, the plaintiff must present evidence which shows . . . 'that there was a causal connection between the protected speech and the adverse employment decision.'" Cotarelo, 460 F.3d at 251 (quoting Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000)). A causal connection between the protected activity and an adverse employment decision can be established "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004) (citing

Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)).[5]  A "showing that the protected activity was closely followed in time by the adverse action" can be sufficient to establish the causal connection.  Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal citations and quotations omitted).

    Neron contends that the timing of the adverse employment decisions–the four internal affairs investigations, two thirty-day suspensions and Neron's resignation occurred within the fourteen months following the filing of his CHRO complaint–establishes the necessary causal connection.  Moreover, the Manchester and prisoner's property investigations commenced in the same month as the filing of the CHRO complaint.  According to Neron, the timing of the Manchester investigation is especially suspect because the complaint was initiated on November 8, 2006–a few days after the CHRO complaint was filed–even though the facts on which it was based occurred in July 2005. (See Pl.'s Mem at 17.)  In addition, the first thirty-day suspension without pay was imposed on December 7, 2006–a few days after Cossette received notice of the CHRO complaint–and the second thirty-day suspension without pay was imposed a few weeks later.[6]  A time lapse of a couple of months between the protected activity and an adverse

---

[5]     Neron alleges in his affidavit that, following his first thirty-day suspension, he asked Captain Toupolos why Cossette was treating him this way and was told that "the CHRO complaint wasn't a good idea." (Neron Aff. ¶ 5.)  However, Neron does not argue that this statement constitutes direct evidence of retaliatory animus.  Rather, in his memorandum in opposition to the motion to strike, he states that the statement is offered "to show the state of mind created in Officer Neron by the communication of this information to him."  (Pl.'s Mem. at 4.)

[6]     Cossette argues that the temporal relationship is too attenuated because Neron's resignation occurred more than a year after the CHRO complaint was filed.  The Court finds this argument unpersuasive because the two thirty-day suspensions without pay–which Cossette does not dispute qualify as adverse employment actions–occurred within weeks of his notice of the CHRO complaint.

employment action is usually sufficient to establish a causal connection between the two. See, e.g., Gorman Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 555 (2d Cir. 2001) (adverse decisions that occurred within four months of the protected activity held sufficient to establish causal connection); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (discharge less than two months after plaintiff filed sexual harassment complaint with management provided *prima facie* evidence of a causal connection).

Nevertheless, the temporal proximity between the protected speech and the adverse employment actions is not as clear-cut as Neron suggests. Before he had even filed the CHRO complaint, it is clear that he was not in good standing with the Meriden police department. Between January 2006 and October 2006, Neron or Resendez had asked the Meriden police department to intervene in their domestic disputes at least five times. The department was so concerned about their disputes that a lieutenant issued a directive regarding when Neron could visit his daughter. On one occasion involving a domestic dispute with Resendez, Neron received a written warning for violating department regulations by leaving his patrol post. On the last occasion, in September 2006, Neron was arrested for trespassing and disorderly conduct based on Resendez's allegations that he had trespassed on her property. Although the charges were ultimately dropped, an internal investigation conducted by Sergeant Caponigro concluded that Neron had violated the lieutenant's directive and left his patrol post without notification, and a pre-disciplinary hearing was scheduled. All of these events occurred before Neron filed the CHRO complaint.

The temporal proximity between the speech and the Manchester investigation is not as strong as Neron suggests either. Although the investigation commenced on November 8,

2006–six days after the CHRO complaint was filed–Cossette did not receive notice of the CHRO complaint until at least November 27th. (Def.'s Rule 56(a)(1) Stmt. ¶ 29.) See, e.g., Tunis v. Corning Glass Works, 747 F. Supp. 951, 960 (S.D.N.Y. 1990), aff'd, 930 F.2d 910 (2d Cir. 1991) (evidence that the individual responsible for making the disciplinary determination was not aware of the protected activity may be sufficient to negate causal connection). Moreover, even though the Manchester investigation commenced over a year after the facts on which it was based occurred, Neron acknowledged a legitimate reason for the lapse in time during his deposition. Shane Manchester had recently requested a copy of the investigation's records in order to get a restraining order, noticed that the police incident report stated that Neron would apply for an arrest warrant, and called the department on November 8, 2006 to inquire as to why the arrest warrant had never been issued. (See Neron Dep. 73:23-25-74:1-6).

Because Neron was the subject of two disciplinary investigations, one of which had concluded that Neron had violated two department regulations, before Cossette had received notice of the CHRO complaint, the temporal relationship between the protected activity and the two thirty-day suspensions is not persuasive evidence of causation. "Temporality alone . . . may not be sufficient to show retaliation by an employer . . ." Tavarella v. Town of Wolcott, No. 3:04 CV 895 (CFD), 2008 WL 747668, at *8 (D. Conn. Mar. 18, 2008). "The operative issue is not simply the length of time between the protected activity and the alleged retaliation, but the demonstrated nexus between the two." Oliphant v. Connecticut Dep't of Tranps., No. 3:02 CV 700 (PCD), 2006 WL 3020890, at *10 (D. Conn. Oct. 23, 2006). A plaintiff must provide "some tangible proof to demonstrate that [his] version of what occurred was not imaginary." Cobb, 363 F.3d at 108 (internal citations and quotations omitted).

As additional evidence of a causal connection, Neron contends that three of the internal investigations were based on "thin and questionable charges." (Pl.'s Mem at 17.) For instance, the Manchester complaint contains no statement or complaint form bearing Shane Manchester's signature or contact information. (Pl.'s 56(a)(2) Stmt. Disputed Facts ¶ 6.) In addition, Neron claims that the fact that Jennifer Hayes was asked by an officer to file a complaint against Neron–rather than initiating it on her own–suggests that the officer had an improper motive. (Pl.'s Mem at 6.) Furthermore, Neron continues to dispute responsibility for the improper prisoner inventory and claims that Officer John Williams, the arresting officer, was responsible for the prisoner's belongings. (Pl.'s 56(a)(2) Stmt. Disputed Facts ¶ 8.)

Neron argues that harsh punishments imposed on him provide additional evidence of Cossette's improper motive. The thirty-day suspension imposed for leaving his patrol duty on September 24th was excessive because he had been motivated by concern for his daughter's safety. Moreover, he received a thirty-day suspension for the Manchester and prisoner's property incidents even though he has never known an officer to be disciplined or investigated for these types of charges. (See Neron Aff. ¶¶ 9-11.)

Despite Neron's arguments to the contrary, the record is devoid of any evidence suggesting that the reasons for the internal investigations were pretextual or that the discipline imposed was excessive. Cossette commenced only two of the four internal investigations, and delegated the factfinding for each of the four investigations to a sergeant. (Cossette Aff. ¶¶ 9, 24.) For each internal investigation, the record indicates that the sergeant in charge conducted a thorough investigation, including interviewing Neron and any other persons of interest and writing a detailed report of the factfinding and the sergeant's conclusions. After receiving

notification of each investigation's conclusions, Neron was given an opportunity to defend himself with representation by a union attorney at a pre-disciplinary hearing. Finally, Neron has offered no evidence to support his conclusory allegations that the adverse employment actions taken against him were disproportionately harsh.[7]

In addition, the documentation and factfinding for each investigation does not raise an inference of pretext. Although the Manchester complaint does not contain Manchester's signature or phone number, it notes that the complaint was made "via phone," which presumably explains why some information is missing. (Caponigro Aff. Ex. L.) Moreover, the record indicates that Sergeant Milslage had a more than sufficient basis for concluding that Neron was responsible for securing the prisoner's belongings. In addition to interviewing Neron and Detective Williams about the incident, Milsage viewed a videotape recording of the booking area on the night in question and determined that Neron had processed the prisoner Daley, then tossed Daley's bag on the ground before leaving at the end of his shift. (Id. Ex. M.) Finally, the fact that an officer advised Hayes to file a complaint against Neron suggests that the officer believed Neron was derelict in his duty by failing to issue an arrest warrant when he had probable cause to do so, not that the officer was carrying out Cossette's personal vendetta.

### 3) *Same Adverse Action Absent Plaintiff's Speech*

Even if Neron could establish a causal connection between his speech and the disciplinary actions taken against him, any reasonable trier of fact would conclude that Cossette would have taken the same adverse actions against him regardless of the CHRO complaint. As discussed

---

[7] For purposes of this motion, the Court assumes without deciding that Neron's resignation qualifies as an adverse employment action because Neron thought he would have been fired if he had not resigned.

*supra*, the first thirty-day suspension followed several interventions by the police department in Neron's domestic disputes with Resendez, a written warning to Neron for leaving his post, and an internal investigation that concluded that Neron had left his post a second time and violated a lieutenant's directive. The second thirty-day suspension followed two other internal investigations that concluded that Neron had violated additional department regulations. After the final internal investigation, which concluded that Neron may have violated department regulations and state law by failing to issue an arrest warrant in a domestic violence case, Neron decided to negotiate a resignation and settlement with the city rather than risk termination after a pre-disciplinary hearing. Based on these undisputed facts, it is clear that Cossette and the police department had a more than ample basis for the disciplinary actions taken against Neron.

## IV. CONCLUSION

The Court finds that any reasonable trier of fact would conclude that Neron has failed to establish a causal connection between his protected speech and the adverse employment actions and that Cossette would have taken the same adverse employment actions absent the protected speech. Thus, the Court declines to address Cossette's remaining arguments in support of summary judgment. For the reasons stated herein, Cossette's motion for summary judgment [Doc No. 36] is **granted**.

SO ORDERED.
Dated at New Haven, Connecticut, this  2nd  day of March, 2010.

                                          /s/
                                  Peter C. Dorsey, U.S. District Judge
                                  United States District Court